414 So.2d 1193 (1981)
VULCAN FOUNDRY, INC.
v.
Shirley McNAMARA, Secretary of the Department of Revenue and Taxation, State of Louisiana.
No. 80-C-1824.
Supreme Court of Louisiana.
November 16, 1981.
On Rehearing May 17, 1982.
Rehearing Denied June 18, 1982.
Riley F. Boudreaux, Jr., Lutcher, for defendant-applicant.
G. William Jarman and R. Gordon Kean, Jr. of Sanders, Downing, Kean & Cazedessus, Baton Rouge, for plaintiff-respondent.
LEMMON, Justice.
The issue in this litigation is whether coke purchased by Vulcan Foundry, Inc. for use in manufacturing manhole covers and rims is exempt from sales and use tax.
Vulcan paid under protest an assessment for sales and use tax, contesting that portion of the assessment based on purchases of coke. Contending that these purchases were exempt from taxation either under R.S. 47:301(10) or 305(4), Vulcan filed this action. The trial court rendered judgment in favor of Vulcan, finding both exemptions applicable. The court of appeal affirmed, without reaching the issue as to the second exemption. 387 So.2d 1318 (La.App.).
We granted certiorari to review that judgment. 392 So.2d 693 (La.).

I.
The product standards for the manhole covers and rims manufactured at Vulcan's Louisiana plant require a minimum percentage of carbon content, depending upon the thickness of the particular product. Because scrap iron, the basic raw material *1194 used in the manufacturing process, does not have sufficient carbon content initially and then loses some carbon in the process, carbon must be added during the process to attain the required carbon content in the final product.
Vulcan uses coke (which is 90% carbon) both as fuel for heating and melting the scrap iron and as a source of carbon for raising the carbon content of the final product. In the process Vulcan preheats coke and places a five-foot layer in a cylindrical heating structure called a cupola. Scrap iron and unheated coke are then charged into the cupola in layers on top of the preheated coke. When the iron melts, it permeates the layer of red hot coke.[1] The impurities are then separated from the iron, and the melted iron is poured into forms.
Although natural gas or electrical furnaces could be used, Vulcan uses coke in its process, not only because coke is an efficient fuel, but also because coke provides the additional benefit of adding carbon content to the finished product.[2] The ratio of coke to iron in each batch is regulated, depending upon the quality of the scrap iron, in order to achieve the desired carbon content.

II.
Vulcan contends that its purchases of coke are exempt from sales or use tax because (1) the coke makes up part of the finished product and thus under R.S. 47:301(10) constitutes a material purchased "for further processing into articles of tangible personal property", and (2) the coke constitutes fuel within the contemplation of R.S. 47:305(4).
Difficult questions are frequently presented in cases involving the applicability of the sales and use tax to materials which are used in the manufacturing process and which become a component or ingredient of the ultimate product. See 9 Tax L.Rev. 435 (1954); 30 A.L.R.2d 1439 (1953). In Traigle v. PPG Industries, Inc., 332 So.2d 777 (La.1976), this court held that graphite blades, which are used (and consumed) in the electrolytic production of chlorine and which appear in the manufactured product only as a useless waste material (which could be removed if economically feasible), were not purchased for processing "into" the manufactured product. The court observed that the graphite was not a recognizable integral part or a component part of the ultimate product and held that the graphite was taxable to the manufacturer as the ultimate consumer of that material.[3]
The present case involves even more difficult questions, since carbon from the coke used in the process was an integral and necessary, although minute, component of the manufactured product. We pretermit decision on these important legal and policy questions because we conclude the coke was exempt as coal used as a boiler fuel within the contemplation of R.S. 47:305(4).[4]
When the current sales and use tax laws were enacted by Acts 1948, No. 9, Section 5(d) provided an exemption for gasoline, steam, water and electrical power or energy. Acts 1973, Ex.Sess. No. 13 added "fuel oil and coal when used for boiler fuel" as exemptions under R.S. 47:305(4), perhaps in a legislative attempt, in line with the trend *1195 of the times, to encourage conversion to fuel oil and coal and to conserve natural gas.[5]
We first conclude that coke is coal, although the Department of Revenue and Taxation, urging strict statutory construction of exemptions, contends coke is only a derivative of coal. The evidence shows that coke is the residue of coal after volatile materials have been expelled by destructive distillation. Coke is therefore simply a more efficient form of coal for use as a fuel and should be included within the statutory exemption, if the coke is used as a boiler fuel.
Boiler fuel is not defined in the statute or in Webster's Third New International Dictionary (1971). Since the term is peculiar to industrial plant operations, it is reasonable to view legislative use of the term as applicable to any fuel used to supply energy in an industrial plant.
The Department apparently agreed with this view when it published on August 1, 1974 its Official Regulations interpreting the 1973 amendment to R.S. 47:305 as follows:
"Fuel oil or coal are exempt from sales tax when they are to be used as a power source in an industrial plant or as a substitute for natural gas being used as a fuel."[6]
In the manufacturing process used by Vulcan, all of the coke that is burned is used to heat and melt the scrap iron (although some of the coke incidentally allows carbon pickup by the molten metal). The coke is therefore a fuel or combustible substance which in its entirety is used to provide heat energy in the manufacturing process of an industrial plant.
We accordingly conclude that the Legislature in its 1973 amendment to R.S. 47:305(4) intended to exempt from sales and use tax any coal which is used by the taxpayer as an energy source in an industrial plant or as a substitute fuel for natural gas and that the coke used by Vulcan in its manufacturing process qualifies for that exemption.
The judgment is affirmed.
WATSON, J., concurs in the result.
DIXON, C. J., and CALOGERO, J., dissent and assign reasons.
DENNIS, J., dissents with reasons.
DIXON, Chief Justice (dissenting).
I respectfully dissent. I do not understand that any boilers are involved in this case, nor any boiler fuel.
CALOGERO, Justice, dissenting.
I dissent from the majority opinion, being of the view that La.R.S. 47:305 only exempts coal from taxation when it is to be used for boiler fuel. In the present case, Vulcan Foundry, Inc. did not use the coke for boiler fuel, but rather, to directly provide the heat to melt the scrap iron. While it is true that Vulcan used the coke as the heat source for melting the iron so that quantities of carbon which were necessary to the final product would be added to the iron during this process, that factor presents the question of whether the coke should be exempt from taxation under La. R.S. 47:301(10) as a material purchased "for further processing into articles of tangible personal property," and not under La.R.S. 47:305 as boiler fuel.
DENNIS, Justice, dissenting.
I respectfully dissent.
La.R.S. 47:305 exempts from taxation the sale at retail, the use, the consumption, the distribution and storage to be used or consumed in this state of coal when used for boiler fuel. Vulcan Foundry, Inc. utilizes coke to produce heat for melting scrap iron *1196 and to add necessary, though small, quantities of carbon to the iron. Accordingly, the coke does not constitute coal used for boiler fuel and is not exempt under this section of the statute.

ON REHEARING
MARCUS, Justice.
We granted a rehearing to reconsider whether the coke used by Vulcan Foundry, Inc. in its manufacturing process is exempt from Louisiana sales/use tax. A review of the facts is necessary to make this determination.
Vulcan manufactures manhole covers and rims, drain grates and other "municipal castings" at its plant in Denham Springs. The castings are made of ACTM Class 30 gray iron. Vulcan makes this grade of iron by melting down scrap iron in a large cylindrical-shaped structure known as a cupola. A five-foot bed of heated coke is placed in the bottom of the cupola. Scrap iron and coke are then added in alternating layers. Cold air and liquid oxygen are injected to increase the temperature to the 2400 to 3000 degrees necessary to melt the scrap iron. The molten iron is drained from the bottom of the cupola, separated from the slag and poured into casting forms.
The Department of Revenue and Taxation notified Vulcan that sales, taxes were owed on purchases of coke and liquid oxygen between December 1, 1974 and September 30, 1977. Vulcan protested the proposed assessment[1] and thereafter paid part of the tax alleged to be due, reserving its right to sue for a refund.[2] Vulcan then instituted this action. The trial court held that sales/use tax was owed on the liquid oxygen but concluded that coke was exempt under both the "reprocessing exclusion" and the "boiler fuel" exemption. Department appealed from that portion of the judgment exempting Vulcan's use of coke. The court of appeal affirmed finding that the reprocessing exclusion was applicable; however, it did not reach the issue of whether coke was exempt as boiler fuel. On Department's application, we granted certiorari to review the correctness of that decision. On original hearing, we pretermitted consideration of the reprocessing exclusion because we concluded that the boiler fuel exemption applied. Thus, we affirmed the judgment of the court of appeal. We granted a rehearing to reconsider whether the boiler fuel exemption had been properly construed.
Louisiana imposes a three percent tax on tangible personal property that is sold at retail in this state. La.R.S. 47:302(A)(1) and 321(A)(1).[3] There is also a three percent *1197 tax on such property bought out-of-state but used, consumed, distributed and stored for use or consumption in this state. La.R.S. 47:302(A)(2) and 321(A)(2).[4] The idea is to impose the sales/use tax on the transaction by which the ultimate consumer receives the particular item. However, the legislature has excluded and exempted various items from that tax. One such exemption is the sale and use of "... coal when used for boiler fuel."[5]
Vulcan uses coke, which is a derivative of coal, to melt its scrap iron. The process involves placing the scrap iron and pre-heated coke into a cupola which we concluded, on original hearing, served the same purpose as a boiler. In so doing, we broadly construed the intent of the exemption in derogation of the well-established rule that exemptions from taxation are to be strictly construed and must be clearly and unequivocally and affirmatively established. Roberts v. City of Baton Rouge, 236 La. 521, 108 So.2d 111 (1958) (on rehearing).[6]
Though the term "boiler" is not defined in the statute, we do not think the legislature contemplated a cupola in which scrap iron is melted. The typical boiler is used to convert water into steam. It consists of a furnace, a surface to transmit heat from the furnace to the water and a space where steam can form.[7] Additionally, the steam is contained in such a way as to make use of the pressure which is created, rather than the heat. On the other *1198 hand, a cupola has no furnace or surface to transmit heat; rather, the heat is provided inside of the cupola by the coke. Moreover, the purpose of the heat is to melt the scrap iron rather than to create pressure. Another difference is that a boiler converts a liquid to a gas, but here a solid is being converted to a liquid. In essence, a cupola is nothing more than a large crucible (container for melting or testing metals).[8]
The legislature did not exempt coal (or its derivative, coke[9]) when used for any purpose other than boiler fuel. Here, the coke is used to melt the scrap iron. It is not used to operate a boiler. Accordingly, we conclude that Vulcan failed to clearly, unequivocally and affirmatively establish it was entitled to this exemption from sales/use tax.
We must now consider whether Vulcan's purchase and use of coke fall within the "reprocessing exclusion." As indicated above, Louisiana taxes the sale at retail, the use, consumption, distribution and storage for use or consumption of tangible personal property, whether or not it is bought in this state. La.R.S. 47:302(A) and 321(A). A retail sale is defined in La.R.S. 47:301(10) to mean:
a sale to a consumer or to any person for any purpose other than for resale in the form of tangible personal property, and shall mean and include all such transactions as the collector, upon investigation, finds to be in lieu of sale; provided that sales for resale must be made in strict compliance with the rules and regulations....
The term "sale at retail" does not include sales of materials for further processing into articles of tangible personal property for sale at retail, nor does it include an isolated or occasional sale of tangible personal property by a person not engaged in such business.[[10]] [Emphasis added.]
Thus, if the item is bought for further processing into articles of tangible personal property for sale at retail, no sales/use tax is owed. If, on the other hand, the item is part of the manufacturing process, then the manufacturer is the ultimate consumer and sales/use tax is owed on the transaction.
We previously considered the reprocessing exclusion in Traigle v. P.P.G. Industries, Inc., 332 So.2d 777 (La.1976). That case involved the manufacture of chlorine. Graphite blades were used to make anodes so that electricity could pass through salt water brine in such a way as to break down the brine into its component parts. During this process, the graphite blades were consumed, but about sixty percent of the original anodes were present in the finished product. We held that the graphite blades were taxable to the manufacturer because they were not purchased for further processing into the chlorine. The test we set out for determining whether an item is subject to sales/use tax is the "purpose" for which it was purchased.
The court of appeal distinguished the instant case from PPG because, in PPG, the residue found in the final product was useless waste material and of the nature of an impurity. Here, the presence of carbon in the final product is beneficial to Vulcan. The proper inquiry, however, is the purpose for which the coke is bought.
Vulcan argues that the purpose of using coke is to process carbon into the iron for sale at retail. It points out that ACTM Class 30 gray iron must contain between 3.10 and 3.30 percent carbon. Since the scrap iron does not always contain sufficient carbon, and the melting process results in a loss of carbon, carbon must be added to the iron in some way. One method is to use coke as a heat source because it gives off carbon as it burns. The required *1199 carbon content is achieved by varying the ratio of coke to scrap iron in the cupola. Dr. Tabony, a mechanical engineer and metallurgist, testified that his testing indicated that using coke resulted in a net increase in carbon of .46 percent. Dr. Williams, an expert in the chemistry of foundry products, explained that statement as follows:
If there is an apparent increase of .46 percent carbon in the final product going through this process, that means that for each hundred pounds of product produced you are going to pick up .46 pounds of carbon from the coke. That's just in terms of definition of percentage. For each hundred pounds of final product produced, it's going to pick up .46 pounds of carbon from the coke. Now, if the ratio of coke to metal is one to eight that says that you used 12½ pounds of coke to produce that hundred pounds of final product. If .46 percent went into the coke the rest of it wentpounds per hundred went into coke, the rest went into heat, which is 12.04 pounds. So for every 12½ pounds of coke used 12.04 went into heat net, and I don't see any way to avoid that from the testimony, and .46 poundsalmost a half a poundwent into the metal produced on a hundred pounds produced basis. Now there is a point, however, made by Dr. Tabony that may well be true, namely that if you don't have the metal surrounded with that much coke, you won't get that much carbon in the metal. But that does not obscure the fact that I think I can only say 12.04 pounds goes into heat out of every 12½ pounds and .46 goes into the product.
Dr. Tabony further testified that coke is used because it burns easily and has less volatile gases. Mr. Morgan, vice president and general manager of Vulcan, testified that natural gas or electrical induction furnaces could be used but that coke is a very efficient fuel. He stated that the addition of carbon was a secondary benefit. Moreover, there was evidence that carbon could be added to the molten iron in the form of carbon brickettes.
It is clear from the evidence in this case that coke is purchased for the purpose of heating the scrap iron; the small amount of carbon in the finished product is incidental. The fact that using coke as a fuel has a beneficial side effect does not change the purpose for which it is bought. Accordingly, we conclude that Vulcan's purchase of coke is as a "consumer" for a "purpose other than for resale," that is, for its use as a heat source to melt scrap iron and not for further processing into an article of tangible property for sale at retail. Hence, the court of appeal erred in concluding that Vulcan is not liable for the sales/use tax on the coke purchased by it for use in the manufacture of "municipal castings" made of ACTM Class 30 gray iron. We must reverse.

DECREE
For the reasons assigned, the judgment of the court of appeal is reversed. Judgment is rendered in favor of defendant Shirley McNamara, Secretary of the Department of Revenue and Taxation, State of Louisiana, and against plaintiff, Vulcan Foundry, Inc., dismissing its suit at its cost.
WATSON, J., dissents, being of the opinion that the original decision of this Court was correct.
NOTES
[1] Most of the carbon pickup is achieved when the molten metal passes through the coke layer.
[2] If natural gas or electrical furnaces were used, the manufacturer would have to add expensive carbon briquettes to the melted iron to achieve the required carbon content.
[3] The usual scheme of sales /use tax statutes is to tax only the ultimate consumer.
[4] R.S. 47:305 lists a number of specific exemptions from sale and use tax. Subsection 4, at the time of the sales at issue (1974-1977) in this litigation, exempted:

"The sale at retail, the use, the consumption, the distribution and the storage to be used or consumed in this state of the following tangible personal property.... Gasoline; steam; water (not including mineral water or carbonated water or any water put up in bottles, jugs, or containers all of which are not exempted); electric power or energy; ... natural gas; and fuel oil and coal when used for boiler fuel...." (Emphasis supplied.)
[5] By Acts 1980, No. 159, the Legislature now exempts "all energy sources when used for boiler fuel."
[6] While the Department's expert chemist testified that coke is not a "power source" in Vulcan's operations, he conceded that heat from the coke is the "energy source" and quibbled only with the loose use of the word "power", when no power (defined as the time rate at which work is done) is actually involved in the process.
[1] La.R.S. 47:1563 provides:

The taxpayer, within fifteen calendar days from the date of the notice provided in R.S. 47:1562 may protest thereto. This protest must be in writing and should fully disclose the reasons, together with facts and figures in substantiation thereof, for objecting to the collector's determination. The collector shall consider the protest, and in his discretion may grant a hearing thereon, before making a final determination of tax, penalty and interest due.
[2] La.R.S. 47:1576 provides in pertinent part:

A. A right of action is hereby created to afford a remedy at law for any person aggrieved by the prohibition of courts restraining the collection of tax, penalty, interest, or other charges imposed in this Subtitle. The person resisting the payment of any amount found due by the collector, or of enforcement of any provisions of this Subtitle, shall remit the amount found due to the collector and at that time shall give notice of his intention to file suit for the recovery thereof. Upon receipt of this notice, the amount remitted shall be placed in an escrow account and held by the collector or his duly authorized representatives for a period of thirty days. If suit is filed within the thirty-day period for the recovery of such amount, the funds in the escrow account shall be further held pending the outcome of the suit. If the person prevails, the collector shall refund the amount to the claimant, with interest at the rate of six percent per annum covering the period from the date the funds were received by the collector to the date of refund.
[3] La.R.S. 47:302(A)(1) provides:

A. There is hereby levied a tax upon the sale at retail, the use, the consumption, the distribution, and the storage for use or consumption in this state, of each item or article of tangible personal property, as defined herein, the levy of said tax to be as follows:
(1) At the rate of two per centum (2%) of the sales price of each item or article of tangible personal property when sold at retail in this state; the tax to be computed on gross sales for the purpose of remitting the amount of tax due the state, and to include each and every retail sale.
La.R.S. 47:321(A)(1) provides in pertinent part:
A. In addition to the tax levied by R.S. 47:302A and collected under the provisions of Chapter 2 of Title 47, there is hereby levied an additional tax upon the sale at retail, the use, the consumption, the distribution, and the storage for use or consumption in this state, of each item or article of tangible personal property, as defined in said Chapter 2,... the levy of said tax to be as follows:
(1) at the rate of one percentum of the sales price of each item or article of tangible personal property when sold at retail in this state; the tax to be computed on gross sales for the purpose of remitting the amount of tax to the state, and to include each and every retail sale.
[4] La.R.S. 47:302(A)(2) provides:

A. There is hereby levied a tax upon the sale at retail, the use, the consumption, the distribution, and the storage for use or consumption in this state, of each item or article of tangible personal property, as defined herein, the levy of said tax to be as follows:
....
(2) At the rate of two per centum (2%) of the cost price of each item or article of tangible personal property when the same is not sold but is used, consumed, distributed, or stored for use or consumption in this state; provided there shall be no duplication of the tax.
La.R.S. 47:321(A)(2) provides in pertinent part:
A. In addition to the tax levied by R.S. 47:302A and collected under the provisions of Chapter 2 of Title 47, there is hereby levied an additional tax upon the sale at retail, the use, the consumption, the distribution, and the storage for use or consumption in this state, of each item or article of tangible personal property, as defined in said Chapter 2,... the levy of said tax to be as follows:
(2) at the rate of one percentum of the cost price of each item or article of tangible personal property when the same is not sold but is used, consumed, distributed or stored for use or consumption in this state; provided that there shall be no duplication of the tax.
[5] La.R.S. 47:305(4), as amended by Acts 1973, Ex.Sess., No. 13, provided the following exemption:

The sale at retail, the use, the consumption, the distribution and the storage to be used or consumed in this state of the following tangible personal property.... Gasoline; steam; water (not including mineral water or carbonated water or any water put up in bottles, jugs, or containers all of which are not exempted);... natural gas; and fuel oil and coal when used for boiler fuel.... [Emphasis added.]
Subsequent to the tax years in question, this section was amended by Acts 1980, No. 159, to exempt "all energy sources when used for boiler fuel."
[6] See also State ex rel Kemp v. City of Baton Rouge, 215 La. 315, 40 So.2d 477 (1949); Meyers v. Flournoy, 209 La. 812, 25 So.2d 601 (1946); State v. Pittsburgh Testing Laboratory Corp., 203 La. 147, 13 So.2d 710 (1943); Standard Oil Co. of Louisiana v. Fontenot, 198 La. 644, 4 So.2d 634 (1941).
[7] Encyclopedia Britannica, Micropaedia Vol. II, page 123 (1974 ed.)
[8] Encyclopedia Britannia, Micropaedia Vol. III, page 265 (1974 ed.)
[9] Vulcan's expert witness testified that coke is produced by placing coal in an oven and baking it in the absence of air in order to expel the volatile gases.
[10] La.R.S. 47:301(10) was amended by Acts 1980, No. 756, § 1. However, the changes made are not relevant to the instant case.